Good morning, call 213-1037, Lisa Falen v. Illinois Department of Children and Family Services. On behalf of the Admirals, Mr. Andrew Barr. On behalf of the Admirals, Ms. Laura A. Ward. Thank you, Mr. Barr. You may be seated. Good morning, Your Honors. Counsel, and may it please the Court. Your Honors, this case is about a single mother who smoked a legal substance while her happy, healthy, smart 5-year-old was at home asleep in his bed. There's absolutely nothing in the record suggesting she was unable to provide any care that her son needed. Yet she was indicated under Allegation No. 74 for inadequately supervising her son. Didn't she indicate she was intoxicated from the stuff? Your Honor, in the record she said that she was high. Now, beyond the definitional aspect that that might have, because she's not a medical professional, there's no real knowing exactly what that means to her. That is still inadequate under Allegation of Harm 74. The burden is with the government here. And at bottom, under anchor, because we're talking pre-2012 anchor here, the only part of that definition of neglected child that applies is the government must show that Lisa F. did not provide her son Skyler the, and I'm quoting, care necessary for his well-being. The Department does not dispute that. That's the only aspect of neglected child, the definition of neglected child that we're talking about here. So at bottom, this is a case about deprivation of care. Did Skyler receive the care necessary for his well-being or not? No. Well, you're not assuming or you're not asking us to say he has to actually be injured before this can happen, correct? Absolutely not, Justice Hutchinson. But there does have to be an incident. As the Department points out in its brief, Allegation of Harm 74 has essentially three aspects to it. It has the text of the allegation. It has examples provided by the Department and factors that, as the Department said, are to be considered a non-discretionary aspect that the ALJ must consider before indicating. In this case, if you look at what the government failed to prove at the hearing, there are three different things that the ALJ had to make unlawful and unwarranted assumptions before indicating Lisa F. So going to Allegation of Harm 74, just the text alone, it says a child has been placed in a situation or circumstances that are likely, and that's the key word, likely, to require judgment or actions greater than that child's mental or physical capabilities. That's the first place where the government failed to prove its burden. We have no idea what situation or circumstances were likely to befall Skyler, a five-year-old who's happy, healthy, able-bodied, at home in his bed. But children wake up and they get sick. And if mother cannot attend to them and she admits that there were times when she had done this, legal or not, and she felt good, maybe high, what if he walks out or he vomits and he chokes on his own vomit and dies? Undoubtedly, Justice Hutchison. You have two responses to that. First, the likely aspect of that is the waking up or potential feeling ill, no dispute there. The Department not only needs to show that that is a likely situation, but they also have to go to the second part of Allegation of Harm. It is in the example, but it's also just codifying the anchor standard of the care necessary for Skyler's well-being, is whether or not Lisa was actually able to provide the care that her son needed. So in this case, there's no dispute that Skyler did not need anything. But had he woken up and needed something, the government did not provide any evidence that Lisa would be unable to provide that care. Now, in the record, it's entirely clear that, yes, she said she was high. Maybe this happened once, maybe a few times. It's unclear exactly how many. But in no event, at no part in the record, in the government providing no evidence to this effect, are we unsure that she's unable to supervise her child. As the Department acknowledges in its brief, there is one example provided by the Department in the text of Allegation 74 that says that that can contemplate a situation where you have a caregiver who is present but, and here's the quote, unable to supervise because of some drug or alcohol. That's the second thing that the government failed to prove. There is nothing in the record suggesting Lisa is unable to supervise Skyler because of her K3 usage. The only time that the effects of K3 are discussed in the record at all is first when Lisa F. discusses how it affects her herself. And she said, on the front end, I feel high. It makes me happy. Doesn't that factor also say includes the caregiver's repeated use of drugs? It does, Your Honor. So doesn't that factor assume that if you're using drugs, there's some problem? Your Honor, even if it does, remember at the bottom, this is dealing with a deprivation of care. This isn't about whether or not the parent is at a drug use. There's plenty of parents who are not going to be indicated under Allegation of Harm 74 who are alcoholics. They might have a substance abuse issue. There might be another allegation that applies. Because they're not caught or because they're caught and they're not indicated? Because, you know, people are doing things out in their homes that nobody knows about. But if something comes to the attention of DCFS, and the attention of DCFS is that, in fact, every night this person is getting blind drunk and the kid is sleeping and that's the only caregiver in the house, you don't see a problem with that. There's absolutely a problem with that, Justice Breyer. There's a difference there. There's nothing in the record suggesting she was blind drunk, as your hypothetical says. The only thing in the record suggesting how K-3 affects her is her statement, which says she was coherent and functioned. In the testimony of her Alcoholics Anonymous sponsor, that while Lisa was smoking K-3 in the car on the way to the hospital, the Alcoholics Anonymous sponsor was coaching her on the best way to get detoxification. Lisa subsequently went into the hospital, spoke with all the hospital personnel coherently, and executed the plan that her... So this stuff didn't really affect her that much at all, but it affected her so much that she had to go to a hospital to be detoxed in her own mind. Your Honor, I think that there's two ways to look at this. She was worried about this potentially becoming an issue. I can't get into her brain. Why is it an issue if it's not making her high? I mean, you could smoke cigarettes. You wouldn't go to detox on that. I mean, something drove this woman to go to a hospital to seek detoxification from this substance. And the ALJ or the commissioner, the head of DCFS, couldn't look at that and draw a reasonable inference that this person was getting high on the substance and it was affecting this person to the extent that they have to go get detoxed? Even if that's a reasonable inference, Justice Burke, that's not the showing that ALJ for toxivides, whether or not she's able to supervise her son. So it's not that K-3 affects her. It's not that K-3 makes her higher. It's not even that K-3 might be something that she thinks she has a problem with. It's whether or not when she's a primary caretaker of her child, if she's able to supervise her. How are they to prove that? They can prove that by things like, well, she passed out. Right? Had she passed out and her son needed something, absolutely there's an issue there. But here there's nothing... I mean, just passing out. Okay, so somebody has to get so high or so drunk that they pass out. But other than that, you never get an indicated finding of somebody using drugs or alcohol. Well, Justice Burke, I could address that a different way. In the same example, the department who wrote this said it's a substantial state of stupor, intoxication, etc. Under the Illinois Supreme Court's holding in Sylvester, there's supposed to be no superfluous words in a regulation rule or something like that. So even if we're talking about her being intoxicated, she needs to be substantially intoxicated. Isn't it a fair inference from the evidence that if a person is seeking medical care for his or her substance abuse, that the use is substantial and that they are substantially impaired? If you cannot adjust or address the problem yourself and you seek medical care to do it, isn't it a fair inference that it's substantial? Justice Burke, once someone's an alcoholic, and this is an analogy, but once someone's an alcoholic, they're always deemed an alcoholic. If they realized 15 years later to have two drinks, they might say, I don't have an issue right now, but this could turn into an issue, and I'm going to cut that on the front end. So, again, I don't know exactly what's going through Lisa's mind when she decided to go to the hospital, but perhaps this is great parenting in a sense where she said, this could become an issue, I'm going to catch it on the front end. We're not talking about years of use here. We're talking about a two-week period. Was she worried about getting addicted, or did she feel that she couldn't deal with it? I mean, what was – well, let's go back. Before she went to the hospital, either that day or some day within a reasonable period of time, didn't she have a confrontation with one of those sponsors, or was that right after she was released from the hospital? Your Honor, I believe you're speaking with the discussion she had with another one of her sponsors. She has two alcoholic nonconsensual sponsors. That was directly after she left the hospital. And George, who is the sponsor, said, you know, I don't want you to come over here because I might be in a situation where I would have to call the hotline. Not only was Skyler not there when she arrived, so there's no issue of a primary caretaker. Also, once he met her, he's like, you know, I actually don't need to call the hotline. He didn't call the hotline. So, once again – And her mother called the hotline. Her mother did, and that's a whole other issue, Your Honor, because the mother has ties with the DCFS. This is – she has ulterior motives. Whether or not it's the primary motive, it's unclear, again, with the record. But the mother is the only person in the record that's suggesting that she has issues behind her own truthful testimony saying, yeah, this stuff did make me high. I did do it a couple times when he was at home asleep in bed. All right, so what specifically led her to talk to that gentleman that day that he'd take her to the hospital? What was the incident immediately before? What was the circumstance immediately before? As far as the ALJ's finding of facts in the discussion and the record as a whole, it looks like Lisa just decided this is something that I want to get in front of and stop. She called her sponsors. They agreed to take custody or primary caretaking responsibilities of her son, took her to the hospital. She tested negative for any type of drug or alcohol use, and then subsequently the next day came back. If we're going to go down the timeline just a couple weeks later, actually after speaking with the department, she finished a week-long supervision with the department with no issues and tested negative for drugs. So, I mean, we're not dealing with an issue of repeated alcohol use or something like that. It's truly a woman trying to get on the front end of what could be a problem. We don't even know if it would have been. It could have been a problem. And all of that is almost tertiary to the aspect of whether or not at night on whatever, maybe the one night, maybe the three nights that she was at home with her son and smoked this substance, whether or not she could. That, unfortunately, I think is her problem. If she can't remember what those nights were, we can't put those dates in her head. I mean, she said he was either with me or with a friend or a family member. And if she can't tell us when, that one's her problem. Justice Hutchinson, the burden is not on her. The burden is on the government to prove this. And the government could have done several things. It could have interviewed a neighbor and said, you know, could you please tell me when Skyler stayed with you. The government didn't even ask who was keeping custody of Skyler in those times that he was not with Lisa. So it's not one of these situations where Lisa needs to walk into the hearing and say, this is exactly what it is. Here's my daily planner for the three weeks we're talking about. Look at how good of a parent I was. This isn't a roving mandate for the department. It's exactly opposite. It's the department coming in and saying, no, on this night or this night or these three nights, you inadequately supervised Skyler because you were, one, unable to supervise him because you were in K-3 use, and, two, in a substantial state of intoxication, neither showing was made. And another way, a way that we – something that should be at least noted is the third part of Allegation 74. We've talked about the text. We've talked about the example that the department agrees applies. The third is the factors. The ALJ did not discuss these factors at all. There are three types of factors. There's child factors, carryover factors, and incident factors. The ALJ would have had a truly creative experience doing incident factors because there is no incident. And had the ALJ gone through these incident factors, I really do not believe we'd be here in front of you today. And that alone under the First District's ruling in Violet, if the department has rules, they need to follow those rules. Here, these factors are, as the department said, to be considered. That is a quote. It's not discretionary. Those were not considered at all. The department doesn't suggest that they were. They suggest that it was just implicitly considered because they mentioned things like the son's age and things like that. These are incident factors that are very important for two reasons. First, it helps the reviewing court see if this is a clear error. If the record does not support the finding, that's a clear error under the Supreme Court's rulings. But, two, those factors are one of the sole things that are keeping Allegation of Harm 74 inside the confines of the legislature's definition of a neglected child itself. Because at the end of the day, this still has to be a deprivation of care. If you don't need to show that there's an incident and you don't need to show that the parent was unable to supervise, we're not talking about deprivation of care anymore. We're talking about condemning a parent because you don't agree with their parenting style or you think they made a bad decision on a certain matter. Allegation of Harm 74 all comes back to a deprivation of care for inadequately supervising a child. Did you find any cases in your research that talk about the age of the child, as you've noted, that was what the ALJ noted, that specifically says, we must assume all issues based upon this age. Is there anything out there that says something of that nature? Well, Your Honor, there's a first district court decision, Slater v. DCFS, that says almost the exact opposite. You can't make generalizations about a child's age. You need to look to the actual specifics of the incident. This is a case-by-case basis because it has to be. By all accounts, Skyler is a bright—now, granted, he's five years old, so I'm not suggesting he's going to get up and drive to the hospital if he needs something, right? But he's a five-year-old. He's a smart five-year-old. He shows up to school every morning, happy, healthy, clean. Whenever the DCFS did go to the apartment, they said it was well-furnished, it was clean. So if we're speaking in generalities, Slater says we shouldn't do it. But if we do, she's a good mother. Everybody agrees with that except for potentially the grandmother here. But even the CPI postulate, the DCFS worker, at the end of the day said, yes, she's generally a good mother, but on these certain occasions, she's unable to supervise. All right. And then any cases that specifically say, other than Slater, which talks about don't talk in generalities, anything that tells us that the ALJ must say on Factor 1, on Factor 2, on Factor 3, on Factor 4? Well, Your Honor, the general rule there is from Violet, which basically says the department makes a rule, they need to follow those rules. Here the rule is you need to consider these factors. There are cases, Rule 23 cases, that I don't want to get into because I can't get into that do exactly what you're saying, Your Honor. They say that you need to look at every single one of these factors because of the reasons I've already stated. One, it helps the reviewing court. It makes your jobs and my job much easier to figure out exactly what the ALJ was talking about. And two, that is the link, the hook, that makes Allegation 74 appropriate under ANCA. Because if you can start indicating parents without tying it to a deprivation of care, you can have a Julie Q situation where you can avoid allegation to begin with because it's well beyond the confines that the department has. Well, you say so we know that it would make our jobs easier. Anything is good. Five glasses, prescriptions, I don't want to sit. But is there anything in this record other than that says that this ALJ didn't consider these factors? I'll go with your interpretation of the evidence. Well, I think the best place to look is the department's brief where they pretty much concede that. They say, well, yes, she did not look at the factors. However, she implicitly looked at them because she mentioned things like the child's age. I mean, that alone in the government, I'm sorry, the department can't even look to the to the findings of fact and find that really suggests that, no, the factors weren't considered. And even if the ALJ did consider them without writing, that's not sufficient. We're looking at the record here. The record is not enough. Your Honor, I realize I'm out of time unless you have further questions. All right. Thank you, Mr. Your Honor, please. The court. My name is Laura Ward and I'm here on behalf of DCFS. I just wanted to start by clarifying a couple of things that my opposing counsel said. You ask whether there were any cases talking sort of about whether these going through the factors and whether there's an age maybe where it doesn't need to be considered. I know there are. There were 23 cases. I think one of them is the last case or something when the child was about 8. And when you're looking at an 8-year-old, I think you do need to sort of start looking at how capable is that 8-year-old. Can they be left alone for a few minutes or, you know, do they know, do they have access to phone numbers? They know how to use the phone, that kind of thing. This child, SH, was barely 5. His birthday's in July. This happened at the beginning of August. And I think a barely 5-year-old, it is implicit. Whether or not his mother was capable is one question. But I think it's implicit that if she wasn't capable of taking care of him, that an almost 5-year-old is not capable of taking care of himself. But yet we hear stories all the time of young children, including 5-year-olds, calling 911 because they've been taught to do that by their parents if they're stricken with a seizure, which is not related to illegal or legal drugs. It's a medical condition. Are we going to take every child away from a parent who has epilepsy if that's a single parent and the child is of a certain age? Well, first of all, we're not going to take a parent, a child, away. I mean, being indicated is not the same thing as, you know, having your rights terminated. But that's a good point. I mean, certainly we all read about kids as young as 3 calling 911 when their mother passed out. But I think that's sort of a question of luck, too. I mean, sometimes children, just like everybody else, rise to an occasion. But I don't think that we can presume that any child at that age is capable of it. Now you're asking about an epilepsy. I think that, and I don't know, but I would think that a parent who knows they have epilepsy probably takes certain precautions. If something should happen to a single parent, I would guess that's something that they would train their child to do or have some kind of big red button or something. I don't know. Well, do we know if there's been any training of that nature in this case? I don't know why there would have been. There's nothing in the record in the mother's interview or anybody that said, well, yeah. I mean, she did talk about there were other people in her apartment complex, I think, that she kind of relied upon. But there was nothing to suggest that she had instructed her son, you know, if something happens, run down the hall or something like that. No. Is there any indication that the ALJ in this case considered the factors, specifically the incident factors? I don't think there's any indication that the ALJ specifically looked at each factor. Like I said, I think if you look at the factors, I mean, the first one, the child factors, like I said, I think really could kind of boil them down to, can a child adequately care for himself in these circumstances, whatever the circumstances are? But is it incumbent upon the ALJ to do that under the rules set forth by DCFS? I don't think it's incumbent upon the ALJ to consider each factor. I mean, I think these factors are what they're supposed to look at when they're trying to decide whether or not to indicate. But, you know, I think they're just sort of guidelines. I mean, I think the caregiver capabilities, for example, I mean, they can all be sort of distilled to, you know, can the caregiver care for the child? I mean, like how long does it take the caregiver to reach the child? I mean, that's just irrelevant in this case. I mean, it's obvious she's in the living room or wherever, she's in the house. So I think a lot of these factors depend on what the circumstances of the case are. And I don't think that an ALJ needs to sit there and say, okay, well, here's this factor. Oh, it doesn't apply in this case because of this reason or it does apply in this reason. I think they're sort of, they can be implicitly considered or just discounted because they don't apply. And the factors here are the child's almost five years old and a single parent who's getting high. That's exactly. I think that's what, that's all. Yeah, I mean, the incident factors, for example, frequency of occurrence. I mean, we know it happened sometimes between what she said, 10 to 20 times, but we don't know how many nights that the child was with her or with someone else. I mean, there is some ambiguity in the facts of this case, but I think that's inherent in the circumstances. It happened at night when nobody was there. So we're all focusing on the K3, but there was also some issue of mental illness, a mood disorder. I don't know that it ever was specifically identified that caused her to scratch her skin and other things that she might have done to herself. And back to my question, did the department establish evidence of that disorder in any way during these proceedings? I think there was ample evidence of her mood disorder. I mean, her therapist testified. The records of her past treatments and those kind of things came in. And I think they came in to give us a context of what was going on at this time. I mean, this is, you know, inadequate supervision. So those things are applicable only in the sense of looking at what was going on during these incidents. This mood disorder and this, whatever the actual name, and I can't, it has something to do with it. Dermatitis or something where she picks her skin. She doesn't do anything to the child. She does it to herself. No. And is there any evidence that it causes her not to be able to take care of the child because she's so intent upon picking her own skin? No. No. I think this evidence about her anxiety, I mean, she was, I think, on Zoloft and Xanax, I think, and the picking of her skin. I don't think any of those things rendered her unable to take care of her child. I think it's more a case of whether, I think, like I think her one therapist, Friedman, said she's sensitive to things. I mean, it may have rendered her more sensitive to K3. It may have made her a more anxious parent. But, no, I don't think that she was rendered incapable in any way of taking care of her child because of this mood disorder. I think it's just coupled with the use of K3 made her. Did her therapist testify or those who did come in, did they testify that she was not capable? No, but none of them saw her. I mean, I think the one person who took her to the hospital, she was smoking K3 on the way to the hospital, but her child wasn't there. So nobody ever saw her using K3 and attempting to supervise him. So it's a big question mark. I mean, her therapist talked about her being an exemplary parent, mostly, and that's not disputed. And if she wasn't, she would, if she felt there was a problem, she would call on someone else to look after Skylar, correct? We don't know that because nobody, I mean, she never, there's no evidence that when she was using K3 she ever called anybody. There's nobody who testified to that. What prompted Mother after all of this time to make the phone call? What? Because Mother testified. You mean her mother? Her mother. I think the reason that her mother did it is, I think it appears from the record that, first of all, it was somewhat cumulative. She felt like from June on Lisa was starting to kind of lose it a little bit. I mean, she quit her job, although she testified she quit because of the injury she suffered at the end of July. But I think even, and I think her mother was saying sort of the same thing that the therapist said, that she was becoming more depressed. Her mother was concerned that she was kind of going on the, I guess going down a path toward addiction again. Well, didn't her mother know that she went to detox and left out against addiction? Yeah, she knew because George Kinzer called her and told her that Lisa was on the way over to her house. And so, yeah, she knew that was happening. And she had a confrontation with her mother that day as well? Or was it with the other sponsor? No, she didn't. I mean, what happened is she checked out of the hospital against medical advice. She talked to both her ex-sponsor and she also talked to her therapist. Both of them said go back. Both, I think it was her therapist who expressed concern that if she didn't go back that she might keep using. Anyway, so then she goes back to George Kinzer's house to pick up her son. But in the interim, he had already had his partner take the child to her mother's house. So she called her mother and said, I'm on the way. I'm going to pick him up. And the mother said, I don't want you to. She showed up anyway. The mother called the police. The police were there. I mean, it sounds like just kind of a mess. I mean, the police were there. The mother was there. The stepfather was there. They didn't want to release, the mother didn't want to release her son to Lisa. Lisa got upset. Understandably, she threw her cell phone. So far, she's tested positively negative for any sort of drugs or alcohol. She tested negative the night before. And then she had an anxiety attack, I guess, in the shower that morning. That's kind of where her whole mental condition sort of came in with the K3 thing. She got really anxious. She's like, I can't stay here. During the course of all of this, did DCFS ever deal with a plan for her to deal with this rather than just indicate her this way so that she could not participate in activities with Schuyler? Well, they did instigate a plan, the weak treatment plan or whatever. And she completed it. Which she completed. Yeah, so they did do that. And what about inadequate supervision? What is that? Well, why is that? Excuse me? Why is that? Why is that? I'm not sure. More specifically, maybe just to add on to this question, what specific evidence did the department present regarding her inability to supervise the child on these nights? Well, the only evidence they presented was her admission that she was high, smoking K3, that she checked out of treatment against advice. I mean, that's kind of it. And her, like I said, her sort of generalized mood disorder and anxiety and everything at that time. But... Originally, Ms. Costa-Waite, I believe, or CPI, I don't. Yeah. Indicated her on environmental juries, which, of course, fell shortly within that period of time, and then 74 was added. Right. Did, I mean, this is, can we then say everything that was under environment injurious was basically transferred? Costa-Waite didn't go back out and interview her, did she? She didn't. I mean, I think environment injurious, which has since been validated, was sort of this catch-all, nebulous, that was the problem with it, it was too ambiguous. And so... Until it was reinstated afterwards. It was reinstated, right, but now there's like that additional language in the statute, you know, so that we can get some kind of blatant disregard and all that kind of stuff. So I think, you know, I think 74 is more specific, and it's possible, and I mean, I'm not familiar with all of the different kinds of allegation of harms, but it's possible that there's some other ones that are also specific that kind of could have fallen into the environment injurious as well. And I think just a closer examination of the facts in this case led the department to believe that the more specific inadequate supervision was more applicable in this case. But the state's basic argument in attempting to validate this inadequate supervision is using the same phrase that was used in Julia Q to validate environment injurious, and that is something about the care, and I can't remember what the exact word is now, but the care and control of the child or something under the neglect statute. Well, I mean, I think it is the same. Like I said, I think it's the same sort of part of the statute. I think that's true. A child who's not receiving the care necessary for his or her well-being. I mean, I think that part of this, but I think that allegation 74 is more specific. I mean, I think by using those examples, it tells us, I mean, what you need really for inadequate supervision is you need a child, you know, who's been put in circumstances that are likely to require judgment or action that's beyond his capabilities. And I think those examples tell you, I mean, it's not enough that a parent has one drink at night or something. You need people who, you know, that the caregiver cannot supervise to the extent needed a child at that age. Under the department's rules, if someone is not indicated, I mean, if this woman had been not indicated at the time, would they have still put this week-long plan into effect or would they just then say the case is closed? I don't know the answer to that. I'm just wondering if the indicated finding is some predicate to getting some services in place and making sure the child's okay, or is it not necessary? I don't think it's necessary. So they could still offer the services? Right, and this is a reporting statute, and I don't know all of the department's procedures, but I don't see anything about the reporting statute that, you know, the report sort of even instigates these services. And I know from other indicated cases, just because a parent is indicated doesn't mean the DCFS steps in and provides services. I think it depends upon the case. So I don't think the two really are on the same track. Any other questions? No, thank you, Ms. Warden. Thank you very much. Mr. Barber, the warden. Thank you, Your Honors. Just briefly, right at the beginning of opposing counsel's presentation, he referenced the Velazquez case. That's actually the Rule 23 case I was talking about. So just real quick, the first ruling that is the director's decision had in it that inadequate supervision was warranted is, and I'm quoting, clearly erroneous because the director should have but failed to consider all the factors listed in Allegation No. 74. And then, Justice Hutchinson, going to your question about generalizations, here's another statement that the court made. It's, and I'm quoting, the director should have considered the actual incident rather than abstract propositions by an 8-year-old or a 16-month-old. So that goes directly to your question. This isn't about how a 5-year-old would act. It's how a 5-year-old who knows his neighbors, who's at home asleep in his bed, would act. So it's not just, well, a 5-year-old would generally not be in a good situation around someone who smoked a substance, legal or not. It's, what was Schuyler going to do if he woke up? He stays with his neighbors on a regular basis. And like I said before, the department could have interviewed those neighbors. If she had left this child alone for two or three hours, would that be okay? Your Honor, that undoubtedly would be a much closer case. There would be all kinds of questions about exactly what happened. Because, again, this is about the actual incident. I'm just saying, if you, let's say it's 10 o'clock at night and your 5-year-old's in bed and you say, I'm going to go out and visit with some friends for two or three hours and just leave. There's no problem with that. It could be because nothing happened. The child sleeps through, no problems. And the child's a smart kid, 5-year-old, smart kid. Maybe you could call the police if something happened. Justice Berger, I don't think it's quite that simple. She went next door to her neighbor's house and was still able to help if she needed anything. Once again, the record's devoid of this. I'm not talking about next door to her neighbor's house. Because I'm drawing an analogy between being high, again, whatever that means, being high and not being there. And, you know, the analogy is if you're high, you're not really all there. So let's just say she's high for three or four hours before she goes to bed. And let's say there's an analogy between not being there at all for three or four hours. And that's not a substantially indicative finding. If she did this two, three, four times, you know, over the course of two weeks. Justice Berger, it very possibly could. And here's the difference between your analogy, although I completely understand how similar they are. The difference is it's not just that she's high. She has to be unable to supervise her child. And that's the difference. If she's out at a bar with her friends, she's not going to be able to supervise her child, period. So you're saying it's not a reasonable inference that someone who's high can't supervise their child? That's precisely what I'm saying, Justice Berger. There is a gap there. There's a gap between saying that someone's high or had a second martini or had a couple glasses of wine and saying they can't supervise their child. One, it's an individualized inquiry because I might need more wine to be unable to supervise my child than someone else. But, two, this really isn't about whether or not Lisa smoked K3. That's just what the department hinged onto to suggest that she can't supervise her child. There's nothing saying she can't. I mean, as the department said, it's a big question mark. Well, I agree with you. I mean, I agree. The fact that she didn't do anything doesn't mean she can't supervise. So the question is, I mean, her statements to people where she was high, and then we also have the additional fact that she used this stuff to such an extent during that time period that she felt she had to not just go to an AA meeting some night or to go to outpatient treatment some day or call the therapist and set up an appointment, but to go on a particular night to be detoxed at a hospital. So, I mean, to me that's a little bit different. So you have someone who's said they're high using this stuff over this period of time and then taking the somewhat drastic step of going to a hospital to be detoxed. Sure, Your Honor. And just to be clear, the same sentence that she said she was high, she said she was coherent and could function. Yeah, but again, I mean, the trial fact doesn't have to believe that. I mean, the trial fact can pick and choose what the trial fact believes based upon that person's testimony. She testified in front of the ALJ as to that fact. The ALJ doesn't have to buy that. Yes, Your Honor, that's entirely true. It just goes, if she's going to be self-serving, why would she admit to this to begin with? But in any event, even if we accept that it's true that she's high, one, under the department's own rules, was she substantially intoxicated? It's unclear. Perhaps you can infer that because she went and got treatment at a hospital, but that's not in the record. That, again, is an inference. And all of this, even if she goes in, let's say she's addicted to this. Let's say she's analogous to an alcoholic. That's not enough under Allegation of Harm 74. It's are you able to supervise your child? It's not are you addicted to a substance? Because that turns into a per se rule or something dispositive about substance abuse. That's not what this is. This is a reporting act about the deprivation of care for a child. That's what we're looking at here. Their variable may be an allegation or some other government tool where they could go after a parent because they have a substance abuse issue. That's entirely possible. But Allegation of 74 isn't it. Allegation of 74 is, was Lisa able to supervise her child? There's nothing in the record whatsoever suggesting she can't. And it's the government's burden to prove that she couldn't. And that's the problem. It is the government's burden to prove that. But this is against the backdrop of the deferential standard of review, is it not? It's clearly erroneous, Your Honor. So under the Supreme Court's decision in Abramson, if the record doesn't support it, it's clearly erroneous. So just as in the Velasco's case that opposing counsel referenced, if the ALJ isn't going to look at these factors, the record doesn't support it. If the ALJ is going to make generalized ideas about how a 5-year-old might act as opposed to this one, it's not supported by the record. And here, when they're not going to show that she's unable to supervise her child, they're not going to show that she's in a substantial state of intoxication. And they don't even suggest what likely situation. I agree, Justice Hutchinson. We can sit here and conjecture up what likely situation might befall a 5-year-old. But the department didn't do that themselves. The ALJ didn't do that. That's a situation where you have a record not supporting the result, and therefore it is under the Supreme Court's rules clearly erroneous. And that is the standard we're looking at here. Apparently one of the only people who might have observed her while smoking this K3 was Kinzer when he took her to the hospital? It was actually Natalie Brooks, who is Kinzer's… I get confused. Yes. All right. So she's observed at what end? Did that person testify at the hearing? Yes, she testified. The only thing that—and I'm being as honest as possible—the only thing that she said that might be bad, she said she's not as attentive as when she's sober. But that doesn't mean anything. I mean, of course I'm not near as attentive at night as I am in the morning. You know, that doesn't mean anything. What Natalie Brooks did say and what the circumstantial evidence shows is that as Lisa was smoking the K3 in the car with Natalie, she subsequently went and had a very coherent, productive meeting with the hospital staff. And what that says, if anything—it doesn't have to say anything—but if it says anything, it just substantiates Lisa's own statement. She is coherent. She can function. She's able to both think and execute different things. So had Schuyler walked out of bed and said, I'm sick, there is nothing in the record suggesting that she could not get an ad bill or make sure that he felt okay or whatever she needed to do. Look, again, nothing happened. But had it happened, there's nothing in the record suggesting she wouldn't be able to react to it. And again, that is the governor's burden to prove that it is not her burden to disprove that she couldn't. So unless your Honor has any further questions, we just ask that you expunge out the indication for application of Part 74. We would thank the attorneys for their audience today. The case will be taken under advisement. Thank you for showing recess.